**Opinion issued March 17, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00443-CR

———————————

**RUBEN GARCIA CANTU, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Case No. 1441765**

---

## MEMORANDUM OPINION

Appellant Ruben Garcia Cantu was indicted for possession of marijuana in a useable quantity of more than four ounces and less than five pounds. After the trial court denied his motion to suppress, Cantu pleaded guilty and was sentenced to

four years' deferred adjudication community supervision in accordance with a plea agreement. Cantu appeals the denial of his motion to suppress. We affirm.

## Background

Cantu was charged with the state jail felony of possession of marijuana. Prior to trial, Cantu moved to suppress the search warrant alleging that: (1) the warrant lacked sufficient identifying information in its description of the location to be searched to allow any officer to properly identify the location; (2) the warrant affidavit contained insufficient facts and circumstances to support a probable cause finding; and (3) the warrant affidavit contained false statements and material omissions made knowingly and intentionally or with reckless disregard for the truth that are essential to the probable cause finding.

The trial court held a hearing on Cantu's motion to suppress, during which it heard testimony from Cantu, one witness to the execution of the search warrant, and several officers involved in the investigation. At the conclusion of the hearing, the trial court denied Cantu's motion to suppress. Cantu timely filed this appeal.

### A.     Facts averred in the warrant affidavit

Agent J. Freeman, an officer with the narcotics division of the Texas Department of Public Safety ("DPS"), supplied the warrant affidavit at issue. At the time he drafted the warrant affidavit, Agent Freeman had been with the DPS for 13 years, and he had worked in the Criminal Investigations Division for the

previous year. After further detailing Agent Freeman's training, experience, and qualifications, the warrant affidavit set out the following factual basis for the search warrant.

On August 19, 2014, at approximately 12:50 p.m., Agent Freeman observed a Hispanic male, later identified to be Cantu, arrive at Houston Hydroponics, a hydroponic grow supply store in Houston, Harris County, Texas, while officers were surveilling the retail store. Cantu was driving a vehicle registered to Christina Guadjardo. According to the affidavit, a second DPS agent in the surveillance team, Agent T. Hunter, told Agent Freeman that "he observed Cantu leave the hydroponic supply store carrying a bottle of Pro-mix-Hp, which Cantu placed in the right rear passenger side" of his car. The affidavit explains that Pro-Mix HP is a fertilized growing medium and that Agent Freeman knows that "most items purchased from hydroponic grow supply stores are typically diverted for the illegal indoor cultivation of marihuana."

Agent Freeman averred that officers followed Cantu from Houston Hydroponics to 104 North Main Street. Agent Freeman averred that he then "observed the [sic] Cantu take the bottle of Pro-mix-Hp, from the right rear passenger area of the [car]" and take it into 104 North Main.

Agent Freeman described 104 North Main as a seemingly abandoned commercial property with numerous video surveillance cameras mounted on the

exterior. Agent Freeman further averred that he observed "windows of varying sizes that have light defeating blue painted plywood covering on the windows," and heavy duty security locks on the front and back doors. He then explained that, based on his training and experience, he knows "that grow house windows are blocked off on the inside to avoid the introduction of natural light into grow rooms which would disrupt the growth cycle, as well as to avoid detection by law enforcement." Agent Freeman described the adjoining properties as being in "disrepair," noting broken windows and the absence of security door locks.

Upon querying Harris County Appraisal District on-line records, Agent Freeman learned that 104 North Main was owned by Cristina Mendez, with no property tax exemptions, suggesting that it was a rental property. Agent Freeman averred, based on his training and experience, that "growers typically utilize rentals [sic] homes or rental business property to conduct their operations."

On August 28, 2014, Agent Freeman received electrical consumption records for 104 North Main from Center Point Energy Company. According to those records, the account subscriber was Christina Guadjardo and the 2014 electrical consumption was reported as follows: 3,279 KW in March; 4,527 KW in April; 5,506 KW in May; 7,244 KW in June; 5,913 KW in July; and 6,051 KW in August. Based on his training and experience, Agent Freeman averred that "the power consumption reported by Center Point Energy Company for the size of the

suspected place is a significantly high consumption rate for a commercial property that appears abandoned and has no observable commercial traffic."

Agent Freeman returned to 104 North Main on September 9, 2014. He averred that, at approximately 4:30 a.m., he observed the same car Cantu had been driving previously parked rear first at the suspect location. At approximately 5:22 a.m., Agent Freeman observed a trash removal service empty two dumpsters "beside and near the driveway of the suspected place." At approximately 9:15 a.m., Agent Freeman observed Cantu wearing a black robe and walking a small dog. Agent Freeman averred that Cantu walked towards the same two dumpsters, looking inside each.

The warrant affidavit then recounts Agent Freeman's discussions with Sergeant R. Clark of the Harris County Sheriff's Office, who works narcotics investigations and has particular expertise in cases involving the indoor cultivation and possession of marijuana. Agent Freeman averred that Sergeant Clark explained that hydroponic grow operations typically "consume vast quantities of electrical power" as a result of using grow lights, supplemental air conditioning units, fans, and water pumps. Sergeant Clark concluded that the energy consumption at 104 North Main was consistent with hydroponic marijuana grow house operations.

Relying on these facts, Agent Freeman sought and obtained a search warrant for 104 North Main authorizing officers to search for marijuana, cocaine, and related paraphernalia. The warrant was signed and executed on September 16, 2014. Agent Freeman participated in the execution of the search warrant, whereby officers seized 191 live marijuana plants, 1.5 pounds of processed marijuana, and various supplies related to the indoor cultivation of marijuana.

## B.      Warrant's description of the suspect location

The search warrant describes the location to be searched, the "suspected place," as follows:

> 104 N. Main Street, Pasadena, Harris County Texas, more specifically described as one-story stucco and brick structure, which sits on the south side of N. Main Street. The front of the suspected place has a white stucco facade and a white tin awning covering the entrance. The front entrance of the suspected place faces north, and has two wooden doors with brass kick plates attached to the bottom. There are fourteen windows of varying sizes on the front of the suspected place that have light defeating blue painted plywood covering them. The suspected place gives the appearance of an abandoned building and sits just east of three other apparently abandoned buildings. The suspected place has two security cameras plainly visible on the roof of the building and one security camera visible on the roof east side [sic] of the building. The east side of the suspected place which is visible from the street is constructed of red brick. On the south side of the suspected place a large metal awning is connected to the suspected place [sic] a white entry door is visible to the south of the building. Two security cameras are visible at the rear of the building, one facing east and one facing south.

## C.     Motion-to-Suppress Hearing

On April 29, 2015, the trial court held a hearing on Cantu's motion to suppress, hearing testimony from Cantu, Agent Freeman, and Agent Hunter, among others. Relevant to this appeal, witnesses offered testimony clarifying (1) the basis for claiming Cantu purchased Pro-Mix HP at Houston Hydroponics, (2) physical descriptions of 104 North Main, and (3) physical descriptions of the adjoining buildings.

### 1.     *Purchase from Houston Hydroponics*

As explained by Agent Freeman during the hearing, Pro-Mix HP is "a growing medium fertilizer that hydroponic growers buy to use for their plants." He described its consistency as being similar to a soil. Agent Freeman testified that Pro-Mix HP comes in different sized bottles and that the smallest bottle of Pro-Mix HP he has encountered is a white 20-ounce bottle, smaller than a two-liter bottle. Agent Freeman testified that he has no knowledge regarding what sizes of Pro-Mix HP are available at Houston Hydroponics.

Cantu testified that in March 2015, he and his attorney met with the owner of Houston Hydroponics, William Seward, at the store. Upon searching the store, they found that Houston Hydroponics indeed sells Pro-Mix HP. However, Pro-Mix HP, which Cantu compared to a potting soil, is not packaged in bottles. Instead, Cantu explained that Pro-Mix HP is sold in bales—comparable to a bale of

7

hay—that measure roughly three feet by two feet, weigh at least 60 pounds, and cannot be picked up with one hand.

Cantu's testimony regarding Pro-Mix HP is consistent with an affidavit provided by William Seward which explained that (1) Pro-Mix HP is sold at Houston Hydroponics in the form of a box, (2) Pro-Mix HP is sold in 3.8 cubic foot units that weigh at least 60 pounds and cannot be carried out by one person, (3) Houston Hydroponics does not sell Pro-Mix HP in bottles, and (4) Seward pushes out all Pro-Mix HP purchases on a cart. Seward further provided photographs of Pro-Mix HP as sold in his store and matching the description provided in his affidavit.

Although the affidavit states that Agent Hunter told Agent Freeman that Hunter "observed Cantu leave the hydroponic supply store carrying a bottle of Pro-mix-Hp," Agent Hunter testified at the hearing that he saw Cantu exit the store with a large bag—not bottle—labeled "Pro-Mix HP." According to Agent Hunter, an attendant from the store helped Cantu put the bag into his vehicle, which he relayed to Agent Freeman. Agent Hunter testified that he did not see Cantu carrying a bottle nor did he tell Agent Freeman that he had seen Cantu carrying a bottle.

Additionally, although Agent Freeman's affidavit stated that he personally observed Cantu take the bottle of Pro-MixHP from the rear passenger side of his

8

vehicle into the suspect location, Freeman testified that he never saw the labeling on the bottle that he observed Cantu removing from his car. Agent Freeman testified that he remembered the bottle to be approximately 20 ounces and white. He testified that, because he could not read the label, he could not be certain whether the bottle was, in fact, Pro-Mix HP.

2.      *Physical description of 104 North Main*

Based on maps of the suspect location admitted to evidence during the motion-to-suppress hearing and testimony from Agent Freeman, Cantu established that the warrant's description of the suspect location does not correctly relate the cardinal orientation of the suspect location. As explained by Agent Freeman, he described the orientation of the suspect location relative to where he conducted surveillance across the street. Thus, for example, the front door of 104 North Main does not face due-north—as the affidavit claims—but rather was located north relative to where Agent Freeman was standing as he surveilled the building.

Cantu testified that the front of 104 North Main has 14 windows of varying size. He explained that nine of the windows are covered with "old scrap plywood" and have no glass. The remaining five window frames do have glass, and some— but not all—of those windows are covered with white paper that allows light to pass through. Cantu explained that the property is under construction and the

windows presently would not meet city code requirements. There is a mailbox with "104 North Main" written in chalk on the backside of the property.

Officer Freeman explained that, due to the security cameras, approaching 104 North Main to better inspect these physical features would have hampered the investigation.

3.    *Physical description of the adjoining buildings*

Cantu testified that there are two buildings adjoining 104 North Main, both to the south. The adjoining buildings also have broken windows covered with plywood and paper-lining covers other windows. The buildings adjoining 104 North Main all have white awnings and stucco exteriors. The immediately adjoining building, 106 North Main, only has the first two numbers in its address displayed, with the number "6" missing. Cantu could not recall how long the final number in its address had been missing.

Cantu testified that there is an alley behind 104 North Main. An operational business, the Pasadena Shooting Range, is on the property across the alley from 104 North Main. There are two dumpsters behind 104 North Main. Agent Freeman testified that he did not know to whom the dumpsters behind 104 North Main belonged. According to Cantu's testimony, those dumpsters belong to the Pasadena Shooting Range, and he has never used the dumpsters.

## Sufficiency of Warrant Affidavit

In his first and second points of error, Cantu contends that the trial court erred in denying his motion to suppress because the warrant affidavit includes false statements made knowingly and intentionally, or with reckless disregard for the truth, and the false statements therein are necessary to the finding of probable cause.

## A.     Standard of Review

The trial judge at a suppression hearing is the sole trier of fact and the judge of the credibility of the witnesses and the weight to be given the evidence. *Hinojosa v. State*, 4 S.W.3d 240, 247 (Tex. Crim. App. 1999); *Janecka v. State*, 937 S.W.2d 456, 462 (Tex. Crim. App. 1996). Accordingly, we review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997)); *Jones v. State*, 338 S.W.3d 725, 739 (Tex. App.—Houston [1st Dist.] 2011), *aff'd*, 364 S.W.3d 854 (Tex. Crim. App. 2012). We give almost total deference to a trial court's rulings on questions of historical fact, and we review de novo the trial court's application of the law. *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015) (citing *Guzman*, 955 S.W.2d at 89); *Jones*, 338 S.W.3d at 739. When no findings of fact were made, we assume the trial court made implicit findings of fact that

support its ruling, so long as such implicit findings are supported by the record. *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

Owing to the preference for searches based on warrants, reviewing courts ordinarily must give "great deference" to a magistrate's probable cause determination. *Cuong Phu Le*, 463 S.W.3d at 876 (first citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657 (1996); then citing *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317 (1983)). "But that deference to the magistrate is not called for when the question becomes whether an affidavit, stricken of its tainted information, meets the standard of probable cause." *Id.* at 877 (citing *McClintock v. State*, 444 S.W.3d 15, 19 (Tex. Crim. App. 2014)). "This is, in part, because a 'magistrate's judgment would have been based on facts that are no longer on the table,' and there is 'no way of telling the extent to which the excised portion influenced the magistrate judge's determination.'" *Id.* (quoting *United States v. Kelley*, 482 F.3d 1047, 1051 (9th Cir. 2007)).

**B.    Applicable Law**

In *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978), the United States Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause,

12

the Fourth Amendment requires that a hearing be held at the defendant's request." 428 U.S. at 155–56.

"An affidavit supporting a search warrant begins with a presumption of validity; thus, the defendant has the burden of making a preliminary showing of deliberate falsehoods in that affidavit before he is entitled to a *Franks* hearing." *Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2003). If the appellant establishes by a preponderance of the evidence that a false statement made knowingly and intentionally, or with reckless disregard for the truth, was included in a probable cause affidavit and was material to establishing probable cause, the false material must be excised from the affidavit. *Franks*, 438 U.S. at 2676. If the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded. *Id.*; *McClintock*, 444 S.W.3d at 19 ("When part of a warrant affidavit must be excluded from the calculus, . . . then it is up to the reviewing courts to determine whether 'the independently acquired and lawful information stated in the affidavit nevertheless clearly established probable cause.'").

While there is an assumption that the basis for a probable cause determination required by the Fourth Amendment be truthful, every fact in a supporting affidavit does not necessarily need to be correct. *Franks*, 438 U.S. at 164–65. A misstatement in an affidavit resulting from simple negligence or

13

inadvertence—as opposed to reckless disregard for the truth—will not render the warrant invalid. *See Dancy v. State*, 728 S.W.2d 772, 783 (Tex. Crim. App. 1987) (first citing *Franks*, 438 U.S. at 171; then citing *United States v. Carlson*, 697 F.2d 231, 238 (8th Cir. 1983); and *United States v. Hole*, 564 F.2d 298, 302 (9th Cir. 1977)).

## C.    Analysis

Cantu maintains that the warrant affidavit contained misstatements made with at least a reckless disregard for the truth and that the misstatements are material to the probable cause finding. In particular, Cantu challenges averments claiming that (1) Cantu was observed purchasing a bottle of Pro-Mix HP at Houston Hydroponics and taking it into 104 North Main and (2) all the windows at 104 North Main were covered with light-defeating blue plywood.

### 1.    *Pro-Mix HP*

Cantu complains of two averments concerning Pro-Mix HP, which the affidavit suggests was purchased by Cantu at Houston Hydroponics and taken into 104 North Main. First, according to the affidavit, Agent Hunter observed Cantu exiting Houston Hyrdroponics with a "bottle" of Pro-Mix HP which Cantu placed in the rear passenger seat of his vehicle. However, Agent Hunter testified at the motion-to-suppress hearing that he saw Cantu leave Houston Hydroponics with a "box" of Pro-Mix HP. According to Agent Hunter, he relayed exactly that to

14

Agent Freeman. Yet, the affidavit reports that Agent Hunter saw Cantu leave the store with a "bottle" of Pro-Mix HP.

Second, according to the affidavit, Agent Freeman "observed the [sic] Cantu take the bottle of Pro-mix-Hp, from the right rear passenger area of the [car]" and take it into 104 North Main. Based on Agent Freeman's testimony during the motion-to-suppress hearing, however, we know that Agent Freeman could not read the label on the bottle.

During the hearing, Cantu established that Agent Freeman misreported what Agent Hunter observed—Hunter said he reported seeing a box, and Freeman reported it was a bottle. Cantu also established that Agent Freeman observed Cantu take a bottle—not a box—out of the rear of the car upon arriving at 104 North Main and that Freeman was not certain of the bottle's contents. However, the trial court reasonably could have concluded that these misstatements were the result of simple negligence or inadvertence. It also reasonably could have concluded that these details were not material to the magistrate's probable cause determination.

Though the Fourth Amendment requires a truthful showing in support of probable cause, "[t]his does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon

15

information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 164–65.

Agent Freeman testified that inaccuracies in the affidavit related to Pro-Mix HP were not intentional. Rather, he described such inconsistencies or inaccuracies as an honest mistake, maintaining that he was working off the best knowledge he had at the time when drafting the affidavit. Though Cantu urges us to conclude that inaccuracies regarding Pro-Mix HP demonstrate at least a reckless disregard for the truth, the trial court reasonably could have instead credited Agent Freeman's testimony that he made an honest mistake in reporting that Hunter saw a bottle and not a box of Pro-Mix HP. *See Franks*, 438 U.S. at 171 (providing that portions of an affidavit not be stricken based on allegations of negligence or innocent mistake); *Hinojosa*, 4 S.W.3d at 247 (providing that trial judge at suppression hearing is sole trier of fact and sole judge of witness credibility and weight of evidence); *Torres*, 182 S.W.3d at 902 (explaining that, in absence of findings of fact, appellate court assumes trial court resolved factual issues in support of its ruling). Similarly, Agent Freeman testified that he believed that the item he saw Cantu take from the rear passenger side of his vehicle into 104 North Main was the same item purchased at Houston Hydroponics. Crediting that

16

testimony, the trial court could have reasonably concluded that Agent Freeman was at least truthful in the sense that the information put forth was believed to be true. *Franks*, 438 U.S. at 164–65. In short, the trial court could reasonably have concluded that Agent Freeman believed he truthfully reported what Agent Hunter had observed, and that is all the Fourth Amendment demands.

Accordingly, we conclude that the trial court did not err in declining to strike the alleged inaccuracies concerning Pro-Mix HP from the affidavit.

### 2. *Windows at 104 North Main*

The affidavit details the state of the windows at 104 North Main in two locations. First, in describing the suspect location, the affidavit reads: "There are fourteen windows of varying sizes on the front of the suspected place that have light defeating blue painted plywood covering them." Second, in the course of detailing the facts of the investigation, the affidavit reads: "Your affiant observed at the suspected place, windows of varying sizes that have light defeating blue painted plywood covering on the windows . . . ." Cantu urges the conclusion that these averments demonstrate a reckless disregard for the truth when considered against testimony and evidence adduced during the motion-to-suppress hearing.

Agent Freeman acknowledged during his testimony that he observed that a majority—but not all—of the windows were covered with blue plywood. Agent Freeman testified that from his vantage point across the street, the remaining

17

windows appeared to be covered with white plywood. Agent Freeman further testified that he could not ascertain from his surveillance location whether any of the window coverings contained holes or gaps such that air or light could pass through, nor could he ascertain whether it was possible to see through the coverings to the interior of the building. Agent Freeman explained during his testimony that he was unable to approach the windows owing to the presence of security cameras and the resulting potential for detection.

Though Agent Freeman was necessarily limited by his vantage point, he testified—and the trial court reasonably could have found—that he truthfully represented the state of the windows in the affidavit. *See Franks*, 438 U.S. at 171; *Torres*, 182 S.W.3d at 902. Accordingly, we conclude that the trial court did not err in declining to strike the alleged inaccuracies concerning the state of the windows at 104 North Main from the affidavit.

We overrule Cantu's first issue. Because we hold that the trial court did not err in failing to excise challenged averments in the warrant affidavit, we need not consider Cantu's second issue which maintains that, after excising challenged averments, the affidavit fails to provide sufficient facts to support a probable cause determination.

**Particularity**

In his third point of error, Cantu contends that the trial court erred in denying his motion to suppress because the warrant's description of the location to be searched was not sufficiently particular to enable officers to locate and distinguish the property intended to be searched.

## A.    Applicable Law

Both the United States Constitution and the Texas Constitution require search warrants to describe the place to be searched with particularity.   U.S. CONST. amend. IV; TEX. CONST. art. I, § 9.  The Fourth Amendment's particularity requirement both prevents general searches and "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search."  *Groh v. Ramirez*, 540 U.S. 551, 561, 124 S. Ct. 1284, 1292 (2004) (quoting *United States v. Chadwick*, 433 U.S. 1, 9, 97 S. Ct. 2476, 2482 (1977)).  "The constitutional objectives of requiring a 'particular' description of the place to be searched include: 1) ensuring that the officer searches the right place; 2) confirming that probable cause is, in fact, established for the place described in the warrant; 3) limiting the officer's discretion and narrowing the scope of his search; 4) minimizing the danger of mistakenly searching the person or property of an innocent bystander or property

owner; and 5) informing the owner of the officer's authority to search that specific location." *Long v. State*, 132 S.W.3d 443, 447 (Tex. Crim. App. 2004).

"A warrant is sufficiently particular if it enables the officer to locate the property and distinguish it from other places in the community." *Bonds v. State*, 403 S.W.3d 867, 875 (Tex. Crim. App. 2013). That said, the Fourth Amendment does not require a perfect description of the place to be searched. *Id.* "A warrant may be invalid upon its issuance because its description of the place to be searched or the person or things to be seized is insufficient on its face. Alternatively, it may prove insufficiently particular as a result of subsequently discovered facts." *Id.* In the latter scenario, the particularity determination will necessarily incorporate extrinsic facts in addition to those found in the warrant's four corners. *Id.* at 876.

**B.    Analysis**

Cantu argues that the warrant's description of the property to be searched is insufficiently particular because it incorrectly references cardinal directions, misstates that all windows had light-defeating blue plywood, and fails to adequately distinguish the property from adjacent buildings. The State responds, first, that Cantu waived particularity arguments by not raising them before the trial court, and second, even assuming the arguments were preserved, the warrant was sufficiently particular.

### 1. *Did Cantu preserve particularity arguments?*

Pursuant to Rule 33.1(a) of the Texas Rules of Appellate Procedure, a complaint is not preserved for appeal unless made to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" and complied with applicable rules of procedure. TEX. R. APP. P. 33.1(a).

While counsel's final argument to the trial court arguably did not delve into the particularity of the warrant's description of the suspect location, Cantu's written motion to suppress and supporting memorandum both unequivocally argued that the warrant lacked sufficient and accurate identifying information in its description of the suspect location. Accordingly, we conclude that Cantu did preserve arguments regarding the particularity of the warrant's description of the suspect location for appellate review.

### 2. *Did the warrant describe the suspect location with sufficient particularity?*

Considering the warrant's four corners and the additional facts adduced in the motion-to-suppress hearing, we conclude that the warrant's description of the location to be searched was sufficiently particular. The description includes the property's street address, complete with city and county, building construction,

21

exterior color, its appearance as an abandoned building, number of windows and the use of blue-painted plywood to cover windows. A photograph of the property to be searched was included immediately below the written description.

Notwithstanding these details, Cantu maintains that the warrant's description of the suspect location fails the Fourth Amendment's particularity requirement because it incorrectly references cardinal directions, misstates that all windows had light-defeating blue plywood, and fails to adequately distinguish the property from adjacent buildings. As demonstrated through the testimony of the affiant, Agent Freeman, the warrant description erroneously describes the orientation of the building relative to cardinal directions. Additionally, during the motion-to-suppress hearing, Cantu and Agent Freeman both offered testimony clarifying that some—but not all—windows are covered with blue plywood, yet the warrant description erroneously states that *all* windows are thusly covered.

Any ambiguity that resulted from the mistaken references to cardinal directions, plywood covered windows, or distinguishing features was resolved by Agent Freeman's personal knowledge of the location to be searched. *See Bonds*, 403 S.W.3d at 876. In *Bonds*, the court considered whether inaccuracies in a warrant's description of the suspect location rendered the warrant insufficiently particular. *Id.* at 875–877. The warrant's description in *Bonds* described the location's street address, including city and county, use as a residence, building

22

construction type, exterior color, roof color and material type, cardinal orientation, number of windows facing a particular street, and a location and description of a nearby garage. *Id.* at 876. Each descriptor accurately described the location save two: the color of the roof and the address. *Id.* Holding that the search warrant was valid, the court noted that (a) the affiant, Ashburn, was personally familiar with the location as a result of four previous visits to the location coincident to his investigation of Bonds's activities, (b) Ashburn participated in the actual execution of the search warrant, and (c) the location actually searched was indeed the location described, albeit imperfectly so. *Id.* at 877. Considering the constitutional objectives of the particularity requirement, the court observed that Ashburn's significant familiarity with the location assured that officers would not search the wrong location, and even with the erroneous descriptors included, the warrant's authorization was nevertheless substantially narrow. *Id.*

Here, the warrant's description accurately specified the address of the suspect property, including city and county, and described it as a one-story stucco and brick structure with a white tin awning covering the entrance, two wooden doors with brass kick plates attached to the bottom, fourteen windows of varying sizes, three security cameras visible on the roof, and two security cameras at the rear of the building. As in *Bonds*, the affiant, Agent Freeman, developed familiarity with the suspect location by personally conducting on-sight surveillance

23

on more than one occasion, and participated in the actual execution of the search warrant. Also as in *Bonds*, the location actually searched was indeed the location described. Owing to Agent Freeman's personal knowledge and participation in the execution of the search warrant, there was little chance that the officers would mistakenly search the wrong location. The remaining descriptors and attached photograph substantially narrowed an officer's discretion in executing the warrant. Accordingly, though the description was imperfect, we nevertheless conclude that the warrant provided a description of the suspect location that included sufficient detail to enable officers to locate and distinguish the property intended to be searched from another in the community. *See Bonds*, 403 S.W.3d at 875–877.

We overrule Cantu's third issue.

## Conclusion

We conclude that the trial court did not err in denying Cantu's motion to suppress, which was based on arguments that the affidavit included material misstatements made with at least a reckless disregard for the truth and that the warrant's description of the suspect location was fatally inadequate. Accordingly, we affirm the trial court's judgment.

Rebeca Huddle
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).